COMMONWEALTH *vs*. WALTER P. MORRIS.

Plymouth.  January 17, 1985. — May 28, 1985.

Present: ARMSTRONG, BROWN, & PERRETTA, JJ.

*Evidence*, Bias, Cross-examination. *Witness*, Bias, Cross-examination.

At the trial of indictments charging the defendant with sexual offenses against two minors, the defendant's nieces, the judge's refusal to permit defense counsel to ask the victims' mother certain questions about custody disputes following the mother's divorce from the defendant's brother did not, in the circumstances, deprive the defendant of an opportunity to show the mother's bias against the defendant's family. [118-119]

At the trial of indictments charging the defendant with sexual offenses against two minors, the prosecutor's question to the defendant about the credibility of the victims, while improper, did not result in prejudicial error where the defense was based solely on the issue of credibility. [119-120]

INDICTMENT found and returned in the Superior Court Department on October 27, 1982.

The case was tried before *Robert L. Anderson*, J., sitting under statutory authority.

*Richard Zorza*, Committee for Public Counsel Services, for the defendant.

*Mary Ellen O'Sullivan*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On an indictment charging statutory rape, the defendant was found guilty of the lesser included offense of assault with intent to rape.[1] He argues that his conviction must be reversed because the judge precluded inquiry of a witness on the issue of her bias against him, see *Commonwealth* v. *Ahearn*, 370 Mass. 283, 287 (1976), and because the prosecutor was allowed to question him about the credibility of

---

[1] The defendant was found not guilty on an indictment charging him with indecent assault and battery on a child under fourteen years of age. The two indictments involved sisters.

certain witnesses. See *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985). We affirm.

I. *The Facts*.

The subjects of the indictments, twin sisters who were about eleven years old in 1981, are the defendant's nieces. Their father (the defendant's brother) and mother were divorced in 1974, and the mother remarried in 1976. The girls (referred to herein as Mary and Jane, not their true names) would see their father fairly regularly, and it was not unusual for them to visit and stay overnight with their paternal grandmother.

In September, 1981, the defendant, who recently had been released from prison out-of-State and had returned to Massachusetts, moved in with his mother. He had found employment and the living arrangement was to be temporary.

On Saturday, November 7, 1981, Mary and Jane arrived at their grandmother's house for an overnight visit. At about 11:00 P.M., Mary went to bed. She slept with her aunt (the defendant's sister) in her bedroom because, according to Mary's testimony, the aunt had a "big bed so two people can sleep in it." Some time later in the early morning (Mary testified that it was still dark outside) Mary was awakened by light coming through the doorway as the defendant, wearing only his undershorts, came into the bedroom. Mary's aunt was asleep, turned away from the door and towards the wall. The defendant went to Mary's side of the bed, knelt down, removed the bedclothes from her, and pulled up her nightgown. She feigned sleep. The defendant placed his hand beneath Mary's underpants, rubbed her vaginal area, and placed his finger into her. Mary related that the defendant kept his finger in her vagina for about five to ten minutes and then he went into the bathroom. That morning Mary told only Jane what had happened.

The girls' mother testified that, after her daughters arrived home Sunday afternoon, she received a telephone call from their father, who was then living in Oregon. The mother spoke with him, and, after this conversation, she called her daughters into her bedroom. The mother asked them if their uncle, the defendant, "had bothered them at all." Jane responded,

"[Mary], not me." Mary then reluctantly described to her mother what the defendant had done. When she finished her account, Jane volunteered that the defendant had done some similar things to her, but long ago. After further conversations with Jane and searching of her own memory of her children's overnight visits with their grandmother, the mother determined that the incident with Jane had to have occurred in the fall of 1979.

The defendant testified and denied that he had ever abused his nieces. As to the 1979 episode, the defendant challenged the hazy testimony on dates with evidence to show that he was incarcerated on most of the weekends that the girls had visited with their grandmother. He was acquitted of any wrongdoing with Jane. See note 1, *supra*.

II. *Bias and Prejudice.*

The mother's testimony followed that of her daughters. Upon cross-examination, the mother related that her former husband visited with the children "pretty regularly" but that there was no set pattern because she and he had joint custody of the daughters. Apparently to dispel any notion of amicability between the mother and father, defense counsel brought out in questioning the mother that joint custody was not part of the "divorce settlement" but was the result of "going to court." When defense counsel pressed with, "You went to court again on a question of custody?" the prosecutor objected. He was sustained, perhaps on the basis that, at this stage, the relevancy of the inquiry was not apparent.

Defense counsel then backtracked in his examination and reestablished the fact of joint custody. Next, and without objection, the mother was asked whether the grandmother had "any legal custody" of the children, and she answered, "No, she didn't." Exercising good judgment, and perhaps hoping to ward off any anticipated objections from the prosecutor, defense counsel asked to approach the bench, where the following occurred:

> COUNSEL:    "I would ask to be allowed to inquire further into any question of custody in court pro-

ceedings, the reason being to try to show bias and prejudice on her part. It is my understanding that there was an attempt by . . . the children's grandmother to have custody taken away from [the mother] because she brought the children there one time and said I don't want them, you can have them; there was then a fairly substantial interfamily fight which I would have to believe left feelings between everyone.

COURT: "Well, the bad feelings would have to be with the defendant, not with the grandmother.

COUNSEL: "Only, again, the ex-set of in-laws, the Morrises' family, and a new husband being Mr. [        ].

COURT "Prejudice has to relate to this defendant, not to some other member of the family.

COUNSEL: "You will note my objection, judge?

COURT: "Certainly."

The defendant argues that by the side bar ruling the judge precluded him from showing that the mother's testimony was biased because of "passionate" feelings against his family arising out of a "bitter custody battle." Moreover, that evidence could show a motive to lie on the mother's part. See *Commonwealth* v. *Haywood,* 377 Mass. 755, 761 (1979). Because any attempts by the grandmother to take custody of the children would be weakened by showing that the children had been harmed by a member of the grandmother's household, we think that defense counsel's explanation as to what he had hoped to elicit, although sketchy, was sufficient to show that he had a right to pursue the point. See *Commonwealth* v. *Ahearn,* 370 Mass. at 287; *Commonwealth* v. *Martinez,* 384 Mass. 377, 380 (1981); *Commonwealth* v. *Henson,* 394 Mass. 584, 589-590 (1985). Our review of the record, however, shows that the matter was in fact explored.[2] The fact that the

---

[2] For example, after resuming his cross-examination of the mother following the bench conference, defense counsel asked the mother whether she, in

issue might not have been pursued to the degree that appellate counsel would have preferred cannot be attributed to an error by the judge.

We understand the judge's ruling to be no more than a statement that any hostility the mother might harbor for the grandmother because of a custody dispute would be irrelevant unless shown to have infected the mother's feelings toward the defendant. The prosecutor clearly did not construe the judge's ruling as precluding inquiry on the topic, and it was his cross-examination of the defendant, presumably in response to the testimony summarized in note 2, *supra*, that brought the matter into even sharper focus.[3] That the judge did not intend by his ruling to preclude inquiry on the issue of a custody dispute as a cause of hostility can be seen from his comment to the prosecutor, who, in cross-examination of the defendant about the interfamily feelings, had unquestionably gone too far:[4] "[T]his is not an issue, the custody in this case, and the only reason it is

1979, had brought her daughters to their grandmother and asked her "to keep them and take care of them." The mother replied, "Not to my knowledge, no, I didn't." In answer to questions about her relationship with the defendant's family, the mother stated that she had known the defendant for about fifteen years, that she had not seen her former sisters-in-law since the incident in issue, and that her contact with the defendant's family was, at the time of trial, mostly with her former husband. He had returned from Oregon and was picking up his daughters at the mother's house for visitation "pretty regularly." The prosecutor took no objection to any of defense counsel's questions.

The defendant testified, without objection, that his mother had been "torn" because she had tried to take Mary and Jane from their mother and the mother had retaliated by attempting (although failing) to obtain a restraining order to prevent the grandmother from visiting with the daughters. See also notes 3 and 4, *infra*.

[3] On cross-examination of the defendant, the prosecutor attempted to elicit agreement from the defendant that the "custody problems" were no concern of his, but the defendant pointed out, "They are my family. I have some concern on that, yes." The defendant also responded to another question with the answer that the mother did have hostility towards him. When the prosecutor intimated that any such hostility would be without reason, the defendant pointed out that the mother's second husband had tried to shoot him and that he (the defendant) had caused the police to investigate the matter.

[4] When the defendant further testified on cross-examination that his family had been concerned about the "drug situation" at the mother's house,

in the case at all is to show whether there was any bias or prejudice on the part of any party or another which you can weigh. We won't have a collateral issue . . . and we're not trying any divorce or custody situation in this hearing."

We think that reason for any hostility had been brought sufficiently to the jury's attention. It is understandable that the defendant would have preferred the information to be elicited from the mother rather than from him. See *Commonwealth* v. *Britland*, 300 Mass. 492, 496 (1938). However, any limitations on the scope of the cross-examination of the mother were, in our view, self-imposed. "The judge made no 'unequivocal adverse ruling' against a line of questioning, as in *Commonwealth* v. *Graziano*, 368 Mass. 325, 330 (1975), nor did he exclude 'the total inquiry by his several rulings,' as in *Commonwealth* v. *Ahearn*, 370 Mass. [at 287]." *Commonwealth* v. *Cheek*, 374 Mass. 613, 615 (1978). We see no error.

III. *Improper Questions.*

If there is a saving distinction between the questions held to be improper in *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 401-402 & n.2 (1983), and in *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 708-709 & n.2 (1984), and that here put to the defendant — "There is no reason for [Mary and Jane] to lie, is there?" — we fail to see it. Although *Long* was decided subsequent to this November, 1983, trial, *Ward* had been issued some eight months before the prosecutor put the question. Belatedly seeing the error of its way, the Commonwealth argues that it has been saved from reversible error by the defendant's "innocuous" response, "Not that I know of, no."

We make no comment on the Commonwealth's contention and, for a different reason, conclude that the defendant suffered no material prejudice from that question or from several others

including "junkies" on the floor, and that for that reason the grandmother had retained an attorney to secure custody of the children with her, the prosecutor went astray in asking how the grandmother could be concerned and want the children "with the drugs you had in your house." It was there that the judge drew the line.

which were of a comparable nature. We think that the error could not have made a difference in light of the context of the evidence adduced and the posture of the defense, that is, that the assaults and touchings had never happened. See *Commonwealth* v. *Dickinson*, 394 Mass. at 707.

As explained in *Commonwealth* v. *Ward*, 15 Mass. App. Ct. at 402, one of the evils in a "line of questioning designed to cause a witness to characterize another witness's testimony as 'lying' [is that] a lawyer implies to the jury that differences in the testimony of the witness and any other witness 'could only be the result of lying and not because of misrecollection, failure of recollection or other innocent reason.' *United States* v. *Narciso*, 446 F.Supp. 252, 321 (E.D. Mich. 1977)." Here, however, the defendant put before the jury his defense that his nieces had engaged in exaggerated, childish fantasy which was exploited by the mother in her hostility against the defendant and his family.

The defendant described his affection for his nieces and how he found their testimony emotionally painful; "they rehearsed it quite well." Although in his closing argument defense counsel was quick to disclaim any notion that he was alleging that the children had lied, he nonetheless pointed out, in numerous and specifically detailed respects, that their testimony was "odd." He attributed the unbelievable aspects of their testimony to the fact that Mary and Jane, as other youngsters but especially twins will do, shared and embellished their secrets. We put it another more direct way: Mary and Jane had lied, as children will do. When this treatment of the children's testimony is viewed with the attack made upon the mother's credibility, we are satisfied that the error did not produce prejudice.[5]

*Judgment affirmed.*

---

[5] The defendant claims that the error in the questions was aggravated by the prosecutor's closing argument, wherein he stated that defense counsel "would have you believe" that all the witnesses for the Commonwealth had lied. Passing over the fact that no objection to the argument was taken, we think it fair comment. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 422-423 (1978).