## Commonwealth *vs.* Timothy Miller.

Hampden. September 11, 2001. - October 11, 2001.

Present: Marshall, C.J., Greaney, Ireland, Sosman, & Cordy, JJ.

*Rape. Homicide. Practice, Criminal,* Capital case, Required finding. *Evidence,* Expert opinion, Prior misconduct, Alibi. *Constitutional Law,* Assistance of counsel. *Attorney at Law,* Conflict of interest, Representation of differing interests. *Conflict of Interest.*

At the trial of an indictment alleging aggravated rape, the defendant's motions for a required finding of not guilty were properly denied, where the evidence, while largely circumstantial, was sufficient to warrant a finding by the jury beyond a reasonable doubt that the defendant was guilty of the charge. [278]

At the trial of indictments alleging aggravated rape, murder in the first degree, and felony-murder, the testimony of a medical examiner that the killing was a "sexually related death" was not error, where the statement was based on the evidence as to the nature of the killing, the medical examiner's examination of the crime scene, the results of his medical examination and autopsy of the victim, and his expertise and experience as a forensic pathologist. [278]

At the trial of indictments alleging aggravated rape, murder in the first degree, and felony-murder, the judge properly excluded evidence proffered by the defendant seeking to show that the victim's boy friend committed the murder or had the motive to commit the murder, where the evidence, which consisted of the testimony of a third party as to altercations he had had with the boy friend four years before the victim was murdered, was too remote in time and involved collateral issues. [279]

At the trial of indictments alleging aggravated rape, murder in the first degree, and felony-murder, the representation by the defendant's counsel of another defendant on appeal in a separate action did not constitute an actual or genuine conflict of interest or cause inadequate representation of this defendant at trial, where, although that other defendant had presented evidence at his trial that this defendant was actually guilty of the killing in that case, that line of defense was not an issue in the other defendant's appeal, and where no "new" evidence could arise from this defendant's trial that could link this defendant to that other case. [279-283]

Indictments found and returned in the Superior Court Department on September 6, 1996.

The cases were tried before *Judd J. Carhart,* J., and a motion for a new trial, filed on October 27, 1999, was heard by him.

*Ruth Greenberg* for the defendant.

*Elizabeth Dunphy Farris*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of aggravated rape and of murder in the first degree on the basis of extreme atrocity or cruelty and felony-murder (with aggravated rape as the underlying felony). The trial judge denied the defendant's motion for a new trial. Represented by new counsel on appeal, the defendant argues that (1) the judge improperly excluded evidence of prior bad acts committed by Steven Maynard, the victim's boy friend, who, the defendant alleged at trial, had committed the murder, and (2) a new trial is required as the result of the dual representation of the defendant (at trial) and another defendant, Charles Thompson (on appeal), by lawyers with the Committee for Public Counsel Services (CPCS). In his pro se brief, the defendant argues that (1) he was entitled to a required finding of not guilty on the aggravated rape charge (and necessarily thereby on the felony-murder charge) because of the insufficiency of the Commonwealth's evidence, and (2) there was error in admitting testimony of the medical examiner characterizing the victim's killing as a "sexually related death." We reject the defendant's arguments on the required finding and evidentiary issues. On the principal issue, the allegation that a new trial is required because of the existence of an actual conflict of interest, we conclude that the defendant has failed to demonstrate the existence of such a conflict. Finally, we conclude that there is no basis to exercise our authority under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict of guilt on the murder charge. Consequently, we affirm the judgments of conviction, and the orders denying the defendant's motion for a new trial, motion for reconsideration, renewed motion for reconsideration, and final motion for reconsideration.

Based on the evidence in the Commonwealth's case, the jury could have found the following facts. Concerned when learning that the victim had not reported to work on Monday, August 28, 1995, the victim's father, after having left a message for the victim on her answering machine, went to her apartment in Agawam. He knocked and tried opening the door to the victim's

apartment, but it was locked. The defendant, who lived with his girl friend in a nearby apartment unit, approached the victim's father and told him that he had not recently seen the victim or her car. At the family's request, police officers entered the victim's apartment and discovered her body. She was twenty-three years old.

The victim's nude body was found beneath a comforter on the floor of her apartment. The victim was discovered lying on her back. She had died the day before from multiple stab wounds, four to her chest and seven to her back. She had significant injuries to her head, neck, anal, vaginal, and groin areas. The victim's head and neck injuries were consistent with a blunt force trauma and with asphyxiation. She had also suffered defensive wounds to her hands and arms.

Although there were signs of a struggle near the victim's door, there was no indication of forced entry. One set of the victim's apartment keys was found, separate from the rest of her keys, in the kitchen sink. Other items found in the sink included a bloodstained towel, a black T-shirt, the broken handles of knives, a bent paring knife, and a very large knife blade. All the items in the sink were wet. There was dried blood on the kitchen floor, and dried blood and spattered blood elsewhere in the apartment. A bloodstained knife blade was recovered near the victim's bureau. The victim's underwear was found on the floor in front of a closet door, away from folded clothing that she had worn when she was last seen on the previous Sunday morning at about 3 A.M. by a police officer who had responded to her report of a burglary. Later that morning, a neighbor heard a woman's voice coming from the victim's apartment cry out, "Don't, don't, no"; the neighbor heard "something bang after that," followed by silence.

As police officers and State troopers investigated the crime scene, the defendant watched. When approached by a State trooper, the defendant falsely identified himself. The trooper subsequently returned to the defendant's apartment and obtained a written statement from him. Later that evening, the defendant reported to the Agawam police department for further questioning. During the interview, he confessed to having burglarized the victim's apartment.

A subsequent search of the defendant's apartment revealed that the defendant was in the process of moving. Police found a bloodstained towel and wet bloodstained clothing in his apartment. One of the State troopers noticed bloodstains in the defendant's bathroom sink and on his medicine cabinet. Police seized a pair of wet "bicycle riding" gloves.

The defendant was arrested and was charged with burglary of the victim's apartment. In another statement, the defendant claimed to have returned to the victim's apartment (after having burglarized it) on the Sunday in question, and to have engaged in consensual sexual relations with the victim at that time. He told a State trooper that, "When the evidence comes back, you will know who it points to," and "I just can't admit to killing her." After being escorted to a cell, the defendant asked the trooper who had interviewed him when the police would have the results from the evidence they had collected. The trooper replied that it would be tested as soon as possible, and asked the defendant if he had killed the victim. The defendant replied, "When you get your evidence back and it's positive, I would be more inclined to say 'yes.' " The defendant later told a police officer, "[U]ntil your evidence comes back, I just can't admit it."

Bloodstains from the victim's apartment and from objects seized therein were consistent with the blood types and DNA profiles of both the defendant and the victim.[1] A boot print matching a boot seized from the defendant's apartment was discovered on the top of an air conditioning unit frame outside a rear window of the victim's apartment. Blood found in the defendant's apartment was consistent with his blood type and DNA profile. A pubic hair found lying on top of the victim's body was not consistent with her pubic hair, but was not inconsistent with one removed from the defendant.

---

[1]The defendant did not dispute the forensic evidence linking him to the victim's apartment. He claimed that he cut his leg while burglarizing the victim's apartment and wiped the blood off with a towel. His counsel, in closing, argued that while the defendant was having consensual sexual intercourse with the victim the day before her body was discovered, his cut "reopened," thus explaining the presence of the defendant's blood on the floor in various areas of the victim's apartment. The victim's boy friend, Maynard, whom the defendant claimed killed her, was excluded as a source of blood found in the victim's apartment.

1. The defendant's motions for a required finding of not guilty on the aggravated rape charge were properly denied. The Commonwealth's evidence, while largely circumstantial, was, when considered under the governing standard, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), sufficient to warrant a finding by the jury beyond a reasonable doubt that the defendant was guilty of aggravated rape. We reject the defendant's contention that the absence of semen in or on the victim is significant. The presence of semen is but one way of proving penetration. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 33 (2000), and cases cited. In this case, the victim was discovered nude lying on her back. Her underwear was found across the room. In addition to the injuries to her head, and stab wounds to her body, which resulted in serious bodily injury and death to the victim, the victim's thighs were bruised, and her vaginal opening had been injured. The medical examiner testified that the injuries to her vaginal opening were consistent with having been penetrated. The pubic hair consistent with the defendant's was found on top of her body. This evidence, together with the forensic evidence implicating the defendant in the victim's murder, was sufficient to prove beyond a reasonable doubt that the defendant had raped the victim. The jury also were able to consider the defendant's admission that he had engaged in sexual intercourse with the victim in her apartment on the day before her body was discovered. The jury were free to reject the defendant's suggestion that his sexual intercourse with the victim was consensual. Additionally, the defendant's contention that Maynard, the victim's boy friend, committed the crimes went to the weight of the Commonwealth's evidence and was a contention for the jury to evaluate. See *Commonwealth* v. *McGahee*, 393 Mass. 743, 750 (1985).

2. There was no error in admitting the medical examiner's testimony (which was not objected to) that the victim's killing was a "sexually related death." The statement was properly based on the evidence as to the nature of the killing, the medical examiner's examination of the crime scene, the results of his medical examination and autopsy of the victim, and his expertise and experience as a forensic pathologist. See *Commonwealth* v. *Pikul*, 400 Mass. 550, 554-555 (1987).

3. At trial, the defendant sought to introduce evidence that Maynard, the victim's boy friend who testified at the trial, had assaulted one Michael Mannix on two occasions in 1991, and that Maynard's mother (or stepmother) had provided an alleged false alibi for him in contesting criminal charges connected to one of the incidents. The defendant's intention in seeking to admit evidence of these assaults and other bad acts of Maynard was to demonstrate Maynard's jealousy over another man seeing the victim and to show that Maynard may have fabricated an alibi to remove suspicion from himself as the victim's killer. After Mannix testified at a voir dire hearing in response to the Commonwealth's motion in limine to exclude the evidence, the judge disallowed the inquiry. The defendant argues that the exclusion of the evidence impermissibly undermined his defense that Maynard, not he, was the killer.

The judge's ruling was within his discretion. See *Commonwealth* v. *McGeoghean*, 412 Mass. 839, 841 (1992). The only evidence that Maynard had manufactured a false alibi (in defending against charges arising out of an altercation with Mannix that had taken place sometime in 1991) was Mannix's voir dire testimony to that effect. The judge correctly noted that this evidence was "far too tenuous" and, thus, properly steered the trial away from a collateral issue. See *Commonwealth* v. *Binkiewicz*, 342 Mass. 740, 755-756 (1961).

While the judge recognized the right of the defendant to put evidence before the jury showing that someone other than he committed the crime or had the motive to commit the crime, the judge properly excluded Mannix's testimony of his previous altercations with Maynard as too remote in time and as involving collateral issues. See *Commonwealth* v. *Harris*, 395 Mass. 296, 300-301 (1985); *Commonwealth* v. *Binkiewicz, supra.* As noted by the judge, the altercations in question took place approximately four years before the victim was murdered, and Mannix's testimony did not establish that Maynard directed any violence or threats toward the victim.[2]

4. Some additional background is necessary before addressing the propriety of the judge's denial of the defendant's motion

---

[2]Indeed, the evidence was that the victim had blamed Mannix, not Maynard, for the altercation.

for a new trial, which was based on the claim that the defendant's trial counsel had provided him with constitutionally inadequate representation because of the existence of an actual conflict of interest. On August 3, 1995, a few weeks before the victim in this case was killed, the body of Andrea Thompson was discovered. See *Commonwealth* v. *Thompson*, 431 Mass. 108, 110, cert. denied, 531 U.S. 864 (2000). She had been stabbed twenty-four times. *Id.* at 111. There was no evidence of a sexual assault. *Id.* Her estranged husband, Charles Thompson (Thompson), was charged with her murder, and a jury found him guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. *Id.* at 109. We affirmed the judgment of conviction and orders denying his motions for a new trial and for reconsideration. *Id.* at 122. Thompson's primary defense at trial was that he had been at work at the time his wife was murdered. *Id.* at 113. In addition to this defense, he "also presented evidence of another stabbing [(the victim's murder)] that had occurred . . . after he was placed in custody, inviting the jury to draw the inference that the perpetrator was still at large." *Id.* at 113 n.4.

Thompson was represented by private counsel at trial. In August, 1996, he was assigned counsel, Brownlow M. Speer (Speer) from the appeals unit of CPCS, for his appeal. In June, 1997, Speer learned that Andrew Klyman (Klyman), a CPCS trial attorney, was representing the defendant in connection with the victim's murder. Speer obtained an opinion from bar counsel that the dual representation of the defendant and Thompson by CPCS was a waivable conflict, and Speer obtained a waiver from Thompson. Klyman did not obtain a waiver from the defendant and proceeded to trial without informing the defendant of Speer's representation of Thompson. The defendant did not learn of Speer's representation of Thompson until after his trial.

On learning of Speer's representation of Thompson on appeal, the defendant moved for a new trial, asserting that CPCS's dual representation of the defendant (at trial) and of Thompson (on appeal) constituted an actual conflict of interest, depriving the defendant of effective assistance of counsel. CPCS is considered one law firm for purposes of a conflict of interest

claim. See *Commonwealth* v. *Egardo*, 426 Mass. 48, 50 (1997). The defendant argued that a genuine conflict existed because the representation of Thompson "required [CPCS] to pursue proof of [the defendant's] guilt of the crime allegedly committed by Thompson," which "was in actual conflict with [seeking the defendant's] acquittal." Put differently, the defendant's contention is that an actual conflict exists because CPCS, to exonerate Thompson, has to show that the defendant killed both the victim and Andrea Thompson, and to exonerate the defendant, has to show that the defendant did not kill the victim. After a hearing on the motion, and an examination of the motions and affidavits, the judge entered a written decision denying the motion.

In his decision, the judge found that Thompson's private trial counsel had been allowed access to the grand jury investigation of the victim's murder because Thompson had argued that the material was exculpatory. In addition, the judge found that Thompson had presented evidence at his trial from the grand jury's investigation of the defendant to show that the defendant was an alternate suspect in the Andrea Thompson case and to allege and argue that the Andrea Thompson murder and the murder of the victim in this case were "copycat" crimes. The judge considered a letter from Speer (submitted in response to the defendant's motion to preserve and protect privileged information), in which Speer stated: "By the time I learned that Mr. Klyman was representing [the defendant], it had already been determined that the [victim's] murder did not present an issue of law for Mr. Thompson's appeal, because Mr. Thompson's trial counsel had been able to present the evidence of the [victim's] murder and also to cross-examine the medical examiner about it . . . . Therefore I never suggested to Mr. Klyman that there might be any conflict in his continuing to represent [the defendant] on the charge of the [victim's] murder."

The judge concluded that the defendant had "not made a sufficient showing that CPCS's dual representation of [the defendant] and Thompson constituted a genuine conflict of interest for or prejudiced [the defendant]." He reasoned that the existence of a conflict between Thompson and CPCS did not

compel the conclusion that a like conflict existed for the defendant. He explained that neither Thompson's trial nor his appeal were relevant or material to the defendant's trial, and that the defendant's trial did not present an issue for Thompson's appeal.

The defendant, submitting copies of correspondence from Thompson and Speer requesting materials from the defendant's trial, filed a motion for reconsideration, a renewed motion for reconsideration, and a final request for reconsideration of the judge's denial of the motion for a new trial. The judge denied these motions.

We agree with the judge that the defendant failed to satisfy his burden of establishing the existence of an actual or genuine conflict of interest.[3] Under art. 12 of the Declaration of Rights of the Massachusetts Constitution, a defendant has the "right to the full and undivided loyalty of his attorney. A defendant is entitled to the untrammeled and unimpaired assistance of counsel free from any conflict of interest." *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986). "Where a genuine conflict of interest exists, the defendant's conviction must be reversed. Once a genuine conflict is shown, the defendant is not required under art. 12 to shoulder the additional burden of proving actual prejudice or an adverse effect on his counsel's performance." *Id.* The burden of proving the existence of a genuine conflict of interest lies with a defendant. *Id.* A defendant "is obliged to present demonstrative proof detailing both the existence and the precise character of this alleged conflict of interest; we will not infer a conflict based on mere conjecture or speculation." *Id.* "An 'actual' or 'genuine' conflict of interest arises where the 'independent professional judgment' of trial counsel is impaired, either by his own interests, or by the interests of another client." *Id.* See *Commonwealth* v. *Allison*, 434 Mass. 670, 688 (2001), and cases cited.

---

[3]The defendant does not argue in the alternative that a potential conflict of interest existed. If a conflict is only "potential," a defendant must demonstrate that he suffered actual prejudice as a result of that conflict. See *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459 (1995). See also *Commonwealth* v. *Walter*, 396 Mass. 549, 559 (1986), and cases cited. The defendant does not argue that he suffered actual prejudice as a result of CPCS's simultaneous representation of Thompson on appeal.

Thompson was in custody when the victim in this case was murdered. Consequently, nothing in the Thompson case could have exonerated the defendant. The defendant's assertion of an actual conflict of interest, however, derives from CPCS's alleged interest and duty in "in seeing [the defendant] convicted because the evidence at [the defendant's] trial and . . . conviction [of the defendant] could support Mr. Thompson's claim to a new trial." The defendant's argument ignores the significance of the uncontested fact that the defendant's case was not an issue in Thompson's appeal, because Thompson's trial counsel had presented evidence at Thompson's trial that the defendant was a suspect in the victim's murder and had been allowed to argue that Andrea Thompson's murder and the victim's murder were "copycat" crimes. In convicting Thompson, the jury in that case rejected the theory that the two murders had been committed by the same person, and Thompson never raised any issues concerning this evidence in any postconviction motion or in his direct appeal to this court.

Further, any "evidence" from the defendant's trial would establish, contrary to Thompson's suggestion at his trial, that Andrea Thompson's murder and victim's murder were not "copycat" crimes. While the evidence at the defendant's trial revealed that there were some similarities between the murders of Andrea Thompson and the victim,[4] these similarities were not particularly distinguishable or unique. See *Commonwealth* v. *Harris*, 395 Mass. 296, 300-301 (1985). Although both victims had been stabbed to death, the fact that the victim in this case had been raped significantly distinguished the two murders, as there was no indication of any kind of sexual assault in Andrea Thompson's murder. Thus, no "new" evidence could exist that could link the defendant to Thompson's case.

In short, the defendant has failed to make the required showing. Argumentative alchemy cannot transmute a speculative claim into a demonstrable conflict.

---

[4]Both victims were young and pretty, and lived in neighboring towns. In addition, the victims were murdered within weeks of each other, possibly around the same time, and had been stabbed to death. The fact that the defendant falsely identified himself to the police as "James Thompson" is an odd coincidence, but of no significance.

5. The defendant is not entitled to relief under G. L. c. 278, § 33E. There was sufficient evidence supporting the jury's finding that the defendant committed the murder.

6. We affirm the judgments of conviction and the orders denying the motion for a new trial and motions for reconsideration.

*So ordered.*