**Richard ALLISON, Petitioner,**

v.

**Edward FICCO, Respondent.**

**No. CIV.A. 02–11325–WGY.**

United States District Court,
D. Massachusetts.

Aug. 13, 2003.

James W. Rosseel, Worcester, MA, for Richard Allison, Petitioner.

David M. Lieber, Assistant Attorney General, Criminal Bureau, Natalie S. Monroe, Attorney General's Office, Boston, MA, for Respondents.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

Richard Allison ("Allison") brings this petition for a writ of habeas corpus [Docket No. 1] pursuant to 28 U.S.C. § 2254, challenging his 1995 conviction in the Mas-

sachusetts Superior Court sitting in and for the County of Middlesex for first degree murder, armed robbery, and perjury. Allison's petition raises three grounds for relief: (1) his counsel provided him with ineffective assistance due to a conflict of interest, in violation of his Sixth Amendment right to counsel; (2) the prosecutor included statements in his closing argument that violated Allison's due process rights; and (3) the trial judge's denial of his motion for required findings of not guilty violated Allison's due process rights. Pet. ¶ 12.

## A. Facts [1]

At trial, evidence was adduced that on the afternoon of April 17, 1994, Allison went to a basketball court at Harris Park in East Somerville, where he met Thomas Moran ("Moran"), Gerald Sullivan ("Sullivan"), Jeffrey Hardy ("Hardy"), Christopher Rogovich ("Rogovich"), and other friends. *Commonwealth v. Allison,* 434 Mass. 670, 672, 751 N.E.2d 868 (2001). The group spent the afternoon playing basketball and drinking beer; at one point, Sullivan and Hardy left to purchase marijuana laced with PCP, known as "dust." *Id.* Allison, Sullivan, Rogovich, and Moran subsequently smoked the dust. *Id.* Finding the drugs to be relatively weak, Moran started teasing Sullivan and Hardy, telling them that the drugs they had purchased were fake and that they were "chumps" and "idiots." *Id.*

Later that night, Allison, Sullivan, Moran, and Hardy drove to a bar in Everett, with Hardy in the driver's seat. *Id.* Before arriving at the bar, the group stopped at a friend's apartment, where Moran continued to tease Sullivan and Hardy about

---

1. The following facts are drawn from the Supreme Judicial Court's decision in *Commonwealth v. Allison,* 434 Mass. 670, 751 N.E.2d 868 (2001). These facts are presumed to be correct under 28 U.S.C. § 2254(e)(1). *See, e.g., Gunter v. Maloney,* 291 F.3d 74, 76 (1st Cir.2002).

the drugs' weak effect. *Id.* Sullivan and Hardy then called Steven Murphy ("Murphy") on the telephone and drove to Murphy's house, where Murphy gave them a loaded .32 semiautomatic handgun and instructed them on its use. *Id.* Sullivan and Hardy subsequently returned to the apartment, and the entire group went to a bar. *Id.*

At approximately 10:00 p.m., Hardy told Rogovich that he wanted to leave the bar but that he did not want Moran to come with them. Sullivan, Hardy, Rogovich, and Allison left the bar, but Moran caught up with them, and the group all went to Dunkin' Donuts. *Id.* Hardy repeatedly asked Moran if he was going home, at which point Moran questioned whether the group was trying to get rid of him. *Id.* at 673, 751 N.E.2d 868. Hardy then drove the group to Moran's girlfriend's house in Somerville. *Id.* Moran got out of the car as if to leave but continued to yell taunts at the group, at which point Hardy invited Moran to get back into the car. *Id.* Moran did so. *Id.*

Hardy then drove the car up Route 93 to South Border Road, at which point he stopped at a wooded area. *Id.* Allison, Hardy, and Sullivan got out of the car, walked to a grassy area, and talked privately for a few minutes. *Id.* When they came back, Hardy told Moran and Rogovich that they were going to meet the drug dealers who had sold them the fake drugs. *Id.* The group then drove to a schoolyard in Medford and walked to a playing field, at which point Hardy placed them in different positions, allegedly to wait for the drug dealers. *Id.* Sullivan then pointed a gun at Moran's head and fired, but the bullet did not hit Moran. *Id.* Hardy then took the gun and shot Moran in the face. *Id.* Moran fell to the ground, at which point Allison, Sullivan, and Hardy stabbed him repeatedly and took his wallet. *Id.* at 673–74, 751 N.E.2d 868.

Allison then took a cab to a bar in Everett and stayed there for about forty-five minutes. *Id.* at 673, 751 N.E.2d 868. After that, he went to Murphy's house. *Id.* There, he told Murphy that he, Hardy, Sullivan, and Rogovich had just killed Moran, stating that "[w]e just kept stabbing him ... because he wouldn't go down." *Id.* Allison then asked Murphy for advice about what to do with the gun. *Id.* Sullivan and Hardy later arrived at Murphy's house, at which point Allison, Sullivan, and Hardy split the money ($1000) from Moran's wallet. *Id.* at 674, 751 N.E.2d 868. Moran's body was discovered the following morning with 79 stab wounds to his head, face, neck, chest, arms, legs, and back, as well as a gunshot wound to his face. *Id.*

On May 25, 1994, Allison testified before a grand jury. *Id.* In his testimony, he denied participating in or having information about Moran's murder. *Id.* On June 23, 1994, the grand jury indicted Allison for the murder and armed robbery of Moran, as well as for perjury. *Id.* The grand jury also indicted Sullivan and Hardy for the murder and armed robbery of Moran. *Id.*

For his defense at trial, Allison retained Thomas Amoroso ("Amoroso"), a sole practitioner who shared office space with Rosemary Scapicchio ("Scapicchio"), who represented Hardy, and Stephen Neyman ("Neyman"), who represented Sullivan. *Id.* at 688–89, 751 N.E.2d 868. In fact, Scapicchio played a key role in Allison's retention of Amoroso; after Hardy retained Scapicchio, members of Hardy's family asked Scapicchio to refer an attorney for Allison as well. *Id.* at 693, 751 N.E.2d 868. Scapicchio then connected Allison to Amoroso, and arranged for Amoroso's fee to be paid out of proceeds from a personal injury case involving Hardy's sister—an arrangement to which Alli-

son consented. *Id.* at 693, 695, 751 N.E.2d 868. Although Amoroso, Scapicchio, and Neyman initially met to discuss their clients' defenses, once they determined that those defenses would be antagonistic, they moved to have the cases of each defendant severed. *Id.* at 693, 751 N.E.2d 868. Separate trials were thus ordered. *Id.*

At Allison's trial, Rogovich (who had been granted immunity) and Murphy both testified for the Commonwealth. *Id.* at 674, 751 N.E.2d 868. Allison himself did not take the stand; his defense instead relied on the testimony of one of his friends, Moran's mother, and an attorney. *Id.* At the close of the Commonwealth's case, and again at the close of the trial, Allison moved for a required finding of not guilty; these motions were denied. *Id.*

In his instructions to the jury, the judge stated that the Commonwealth was proceeding under the theory that Allison was either a principal or a joint venturer as to the murder and armed robbery charges. *Id.* at 675 n. 4, 751 N.E.2d 868. The jury subsequently convicted Allison of murder in the first degree on a theory of extreme atrocity or cruelty, armed robbery, and perjury.[2] *Id.* at 671, 751 N.E.2d 868. Allison received a sentence of life imprisonment on the murder conviction, a fifteen to twenty year sentence on the armed robbery conviction (to run concurrently with the life imprisonment), and a twenty-five to thirty year sentence on the perjury conviction (to run consecutively with the life sentence). Resp.'s Mem. [Docket No. 19] at 1–2.

### B. Procedural History

Allison timely appealed his conviction and sentence to the Supreme Judicial Court. *Id.* at 2. While that appeal was pending, Allison filed a motion for a new trial in the Supreme Judicial Court for the County of Suffolk alleging ineffective assistance of counsel. *Allison,* 434 Mass. at 671–72, 751 N.E.2d 868. Specifically, Allison alleged that his counsel's performance had been compromised by a conflict of interest. *Id.* That motion was transferred to the Superior Court, which held a hearing and concluded that Allison had not established the existence of an actual conflict or a potential conflict on the part of his counsel that had materially prejudiced his case. *Id.* at 688, 751 N.E.2d 868. The Superior Court thus denied Allison's motion for a new trial. *Id.* Allison appealed that denial. Resp.'s Mem. at 2. The Supreme Judicial Court then consolidated Allison's direct appeal with his appeal of the denial of his motion for a new trial. *Id.*

In his consolidated appeal before the Supreme Judicial Court, Allison raised numerous grounds, including the three grounds advanced in his habeas petition—namely, ineffective assistance of counsel as well as due process violations arising from the prosecutor's comments during his closing argument and from the judge's denial of his motion for a directed verdict of not guilty. *Allison,* 434 Mass. at 671–72, 751 N.E.2d 868. In *Allison,* the Supreme Judicial Court addressed each of these claims in detail.

With regard to Allison's ineffective assistance of counsel claim, the Supreme Judicial Court explained that under both the United States Constitution and the Massa-

---

**2.** The jury was not asked to specify whether they were finding Allison guilty as a principal or as a joint venturer, as no such specification is necessary. *Allison,* 434 Mass. at 675 n. 4, 751 N.E.2d 868; *see also Commonwealth v. Ellis,* 432 Mass. 746, 761, 739 N.E.2d 1107

(2000) ("[T]he jury are not required to conclude unanimously that the defendant was either the principal or the joint venturer, so long as sufficient evidence exists to support either role.").

chusetts Constitution, criminal defendants are entitled to the assistance of conflict-free counsel. *Id.* at 688, 751 N.E.2d 868. The court further explained that Massachusetts law distinguishes between actual and potential conflicts of interest. *Id.* "To demonstrate an actual conflict, the defendant must show that a genuine conflict existed"; once the defendant makes this showing, no further showing of adverse effect is required to establish ineffective assistance of counsel. *Id.* On the other hand, if the defendant can only show a potential conflict, "the conviction will not be reversed except on a showing of actual prejudice." *Id.*

Applying that framework to Allison's claim, the court first ruled that an actual conflict did not arise merely from the fact that Allison's counsel had shared office space with the counsel for his co-defendants. *Id.* at 688–93, 751 N.E.2d 868. It explained that the attorneys had not held themselves out to the public as a partnership, professional association, or law firm and that each attorney had kept client confidences separate. *Id.* at 691–92, 751 N.E.2d 868. The court further found that no actual conflict arose from the fact that the Hardy family paid the fee of Allison's lawyer, because Allison himself had consented to the arrangement and the arrangement "did not create any obligation [on Amoroso's part] to satisfy the Hardys." *Id.* at 695, 751 N.E.2d 868. The court then considered whether there had been a potential conflict that resulted in material prejudice to Allison. It ruled that there had not: the shared office spaces did not result in a disclosure of any confidential information, and Allison's arguments about various scenarios that might have taken place had he been represented by another attorney amounted to mere conjecture. *Id.* at 696–97, 751 N.E.2d 868. The court thus affirmed the Superior Court's rejection of Allison's ineffective assistance of counsel claim. *Id.* at 697, 751 N.E.2d 868.

With regard to Allison's claim that his due process rights were violated by the prosecutor's allegedly inappropriate comments during his closing argument, the court noted that because Allison's counsel had not objected to the prosecutor's closing argument at trial, the applicable standard was "whether the asserted errors, if any, created a substantial likelihood of a miscarriage of justice." *Id.* at 686, 751 N.E.2d 868. The court then considered the two allegedly improper statements that the prosecutor made. The first of these was the prosecutor's comment that "[W]e can't cut open someone's skull, look inside, and see why. We can just go by what the evidence shows." *Id.* The Supreme Judicial Court rejected Allison's argument that this statement in some way commented on Allison's failure to testify, reasoning that it was simply a comment on the need to use circumstantial evidence to infer Allison's intent. *Id.* The second allegedly improper statement was the prosecutor's comment that the facts of the case against Allison "can be supported not just by testimony but by the body, Tommy Moran's body testified." *Id.* at 686–87, 751 N.E.2d 868. The court rejected Allison's claim that this comment constituted an inappropriate appeal to the jurors' emotions, stating that the prosecutor was pursuing a conviction of first degree murder on the theory of extreme atrocity or cruelty, and that "[t]he condition of the body is often the best evidence of the extreme atrocity or cruel nature of the crime." *Id.* at 687, 751 N.E.2d 868. The court thus ruled that the prosecutor's comments during his closing statement had not given rise to a substantial likelihood of a miscarriage of justice. *Id.*

Finally, the Supreme Judicial Court rejected Allison's argument that the trial judge—in denying his motion for a required finding of not guilty—violated his

due process rights because the evidence was insufficient to support convictions for murder and armed robbery under a joint venture theory.[3] The court explained that:

> When reviewing the sufficiency of the evidence as to joint venture, we consider the evidence in the light most favorable to the Commonwealth and ask whether a rational jury could have found beyond a reasonable doubt that the defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary. Proof that the defendant shared the requisite mental intent needed for a conviction may be met with circumstantial evidence.... In any event, an anticipatory compact is not necessary for joint venture liability, as long as at the climactic moments the parties consciously acted together in carrying out the criminal endeavor.

*Id.* at 675–676, 751 N.E.2d 868 (internal citations and quotation marks omitted).

The court then concluded that these prongs were met here by the testimony of Rogovich and Murphy. As to the murder, the court ruled that there were two pieces of testimony that were each individually sufficient to establish Allison's liability for murder as a joint venturer: (1) the testimony that Allison, Hardy, and Sullivan left the car at South Border Road to engage in a private meeting shortly before Moran's murder; and (2) the testimony that Allison, Hardy, and Sullivan were subsequently seen crouched over Moran while making stabbing gestures. As to the armed robbery, the court ruled that there was evidence that Moran lunged at Sullivan after

Sullivan directed Allison and Hardy to take Moran's money, and that accordingly, "[t]he jury could have found that the focus of the joint venture shifted at that point from one of killing to one of robbery, and that the three men continued to stab and beat Moran for the purpose of taking his money." *Id.* at 677, 751 N.E.2d 868. The court rejected Allison's argument that the testimony of Rogovich and Murphy was inadmissible hearsay, noting that there is a joint venture exception to the hearsay rule, and further noting that "operative statements evidencing the existence of an agreement, i.e., verbal acts, are not hearsay, but are independently admissible." *Id.* at 675–76, 751 N.E.2d 868. The court thus concluded that there was sufficient evidence to support Allison's liability for the murder and armed robbery both as a principal and as a joint venturer. *Id.* at 676–77, 751 N.E.2d 868.

After rejecting each of Allison's other arguments (which related to grounds not raised in the instant petition), the Supreme Judicial Court affirmed Allison's convictions. Its decision was entered on July 25, 2001. On July 22, 2002, Allison filed the instant petition for a writ of habeas corpus.

## II. DISCUSSION

■ The three claims advanced in Allison's petition have been exhausted and are properly before this Court. Because the Supreme Judicial Court adjudicated each of those claims on their merits, this Court must review its determinations using the deferential standard outlined by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA").[4] Under this standard, this Court cannot grant habeas corpus relief unless

---

3. As noted above, the jury had been instructed that it could find Allison guilty either as a principal or as a joint venturer.

4. As will be discussed *infra,* in assessing Allison's ineffective assistance of counsel claim,

the Supreme Judicial Court employed a standard that is more favorable to defendants than is the federal law standard. This in no way lessens the applicability of Section 2254 deference. *See McCambridge v. Hall,* 303 F.3d 24, 35 (1st Cir.2002).

the Supreme Judicial Court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ...." 28 U.S.C. § 2254(d)(1)(2000).

## A. Allison's Ineffective Assistance of Counsel Claim

In rejecting Allison's claim of ineffective assistance of counsel due to a conflict of interest, the Supreme Judicial Court did not apply a standard that was contrary to clearly established federal law. A state court decision is contrary to clearly established federal law only if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

 Thus, this assessment must begin with a discussion of the standard set forth by the Supreme Court for ineffective assistance of counsel claims arising from alleged conflicts of interest. Under the federal standard recently articulated by the Supreme Court in *Mickens v. Taylor*, ineffective assistance is presumed, without any further showing, "*only* where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." 535 U.S. 162, 122 S.Ct. 1237, 1242, 152 L.Ed.2d 291 (2002) (emphasis added). All other cases alleging ineffective assistance of counsel due to a conflict of interest can be divided into two categories. The first category encompasses those cases where ineffective assistance is alleged due to a conflict arising from counsel's simultaneous representation of conflicting interests—that is, cases in which two co-defendants are represented by the same attorney or by attorneys who are associated in the practice of law. *Id.* at 1245–46. In such cases, the defendant must show that the conflict adversely affected his counsel's performance in order to prevail. *Id.* at 1245. The second category comprises cases in which ineffective assistance is alleged due to a conflict arising from something *other* than counsel's concurrent representation of conflicting interests; as to these cases, the Supreme Court has deemed it an open question whether a defendant can prevail simply by making the same showing, that is, that the conflict adversely affected his counsel's performance, or whether the defendant must further make the traditional showing of actual prejudice by demonstrating that his counsel's conflict of interest had a probable effect on the outcome of the trial. *Id.* at 1245–46.

 By contrast, the Supreme Judicial Court has interpreted Article 12 of the Massachusetts Declaration of Rights to mean that once a defendant demonstrates a genuine conflict of interest—that is, "the independent professional judgment of trial counsel is impaired, either by his own interests, or by the interests of another client"—ineffective assistance is presumed and no further showing is required. *See, e.g., Commonwealth v. Miller*, 435 Mass. 274, 282, 755 N.E.2d 1266 (2001). Further, if merely a "potential" or "tenuous" conflict is demonstrated, the conviction will still be reversed upon a showing that the conflict resulted in actual prejudice, that is, that it affected the outcome of the trial by depriving the defendant of an otherwise available, substantial ground of defense.[5]

---

5. The First Circuit has described this standard for measuring actual prejudice as functionally equivalent to the federal standard for measuring prejudice in the context of ineffective assistance of counsel claims—namely, whether there is "a reasonable probability

*See, e.g., Commonwealth v. Croken,* 432 Mass. 266, 272, 733 N.E.2d 1005 (2000) (referring to the standard set forth in *Commonwealth v. Saferian,* 366 Mass. 89, 96, 315 N.E.2d 878 (1974)). In this regard, "[t]he Massachusetts Declaration of Rights ... provide[s] greater safeguards than the Bill of Rights to the United States Constitution." *Commonwealth v. Hodge,* 386 Mass. 165, 169, 434 N.E.2d 1246 (1982).

Allison argues that as applied to his case, the Massachusetts standard applied by the Supreme Judicial Court was actually less protective than the applicable federal standard articulated by the Supreme Court. Allison appears to be suggesting that, under the federal standard, he would be entitled to relief simply by showing a "potential conflict of interest that ... adversely affected trial counsel's performance," and that the Supreme Judicial Court therefore erred by examining whether the potential conflict resulted in actual prejudice to Allison, rather than focusing its inquiry exclusively on the performance of Allison's counsel. Pet'r Mem. at 16.

■ Allison's argument, however, is based upon a misinterpretation of federal law. Had this been a case where Allison's defense counsel was actively representing competing interests (for example, if Amoroso and Scapicchio were indeed associated with the same law firm, and were simultaneously representing co-defendants with antagonistic interests), ineffective assistance would be presumed under Massachusetts law and found under federal law only if an adverse effect on counsel's performance could also be shown. Where, as here, there is no such simultaneous representation of competing interests or other type of actual conflict on the part of defense coun-

sel, Massachusetts law examines whether the asserted potential conflict resulted in material prejudice to the defendant. This is entirely consistent with the Supreme Court's *Mickens* holding that when a conflict of interest is alleged due to something other than counsel's concurrent representation of competing interests, it is an open question whether a defendant can prevail merely by showing that the conflict adversely affected his counsel's performance, or whether the defendant must further make the traditional *Strickland* showing of actual prejudice by demonstrating a probable effect on the trial's outcome. *Mickens,* 122 S.Ct. at 1245–46. As such, in assessing Allison's ineffective assistance of counsel claim under the framework described above, the Supreme Judicial Court did not apply a standard that was contrary to "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

■ Nor was the Supreme Judicial Court's rejection of Allison's claim an unreasonable application of clearly established federal law. A state court decision is considered unreasonable only if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Taylor,* 529 U.S. at 407, 120 S.Ct. 1495. Here, as discussed above, the Supreme Judicial Court decided Allison's claim under a standard that is more favorable to defendants than is the standard articulated by the Supreme Court. Therefore, its federal law adjudication can be considered subsumed within its state law adjudication. *McCambridge,* 303 F.3d at 35.

---

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Stephens v. Hall,* 294 F.3d 210, 214–15 (1st Cir.2002) (citing *Strickland v.*

*Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and noting its equivalence to the Massachusetts standard).

Once the applicable federal law is brought to the forefront, it becomes clear that the Supreme Judicial Court in no way reached a decision that can be considered an unreasonable application of that law. Under federal law, the Supreme Judicial Court would have been limited to a consideration of whether the asserted conflict impaired Amoroso's performance *only* if Allison could first show that Amoroso was actively representing competing interests while serving as his counsel. The Supreme Judicial Court's conclusion that Allison failed to make this predicate showing was not unreasonable. The court engaged in a detailed inquiry to determine whether Amoroso and Scapicchio had held themselves out as a law firm, operated their law office in a manner similar to that of a law firm, protected client confidences, and the like. The court similarly scrutinized each of the various dealings between Amoroso and Scapicchio to assess whether Amoroso was in any way beholden to Scapicchio or to Hardy. Only after concluding that the office space shared by Amoroso and Scapicchio contained none of the trappings of a law firm, and that the fee arrangement did not render any obligation on Amoroso's part to satisfy Scapicchio or her client, did the court conclude that no actual conflict was presented by their representation (in separate trials, no less) of defendants with mutually antagonistic defenses. This Court does not find that determination to have been unreasonable.

That determination, in turn, led directly to the Supreme Judicial Court's conclusion that the relevant inquiry was whether the potential conflict on Amoroso's part had resulted in any actual prejudice to Allison. The Supreme Judicial Court's application of this standard was in no way unreasonable. Whether the "actual prejudice" assessment is made with reference to the Massachusetts standard (did counsel's performance deprive the defendant of an otherwise available, substantial ground of de-

fense?) or to the functionally equivalent federal *Strickland* standard (is there a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different?), Allison manifestly has failed to meet this stringent burden.

Accordingly, because the Supreme Judicial Court's rejection of Allison's ineffective assistance of counsel claim was neither contrary to nor an unreasonable application of federal law, this ground fails as a basis for habeas relief.

## B. Allison's Due Process Claim Arising from the Prosecutor's Comments

Allison's second asserted ground for habeas relief is that the prosecutor violated his due process rights by making improper comments during his closing argument. The Supreme Judicial Court, however, rejected this claim on the basis of an adequate and independent state law ground—procedural default arising from Allison's failure to object to the prosecutor's closing statement in a timely manner. That the Supreme Judicial Court noted Allison's failure to object and then moved directly to an assessment of whether this could be excused by a showing of a substantial likelihood of a miscarriage of justice, *Allison*, 434 Mass. at 686, 751 N.E.2d 868, does not mean that it waived this default. *See, e.g., Gunter*, 291 F.3d at 79 ("The SJC's ruling amounted to nothing more than a decision that [the defendant] would not be absolved from his procedural default under its miscarriage of justice review.... The mere fact that a state appellate court engages in a discretionary, and necessarily cursory, review under a miscarriage of justice analysis does not in itself indicate that the court has determined to waive an independent state procedural ground for affirming the convic-

tion.") (internal citations and quotation marks omitted).

▉▉▉ As such, this Court can only review this claim if Allison can overcome his procedural default through either a showing of (1) cause and prejudice or (2) a fundamental miscarriage of justice that would otherwise result. *Id.* at 81. Allison has not even attempted to make this showing in his habeas petition. Nor could he. In order to show cause for a procedural default, the defendant must show "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* Ineffective assistance of counsel at a level that violates the Sixth Amendment can also constitute such cause, *id.*, but is unavailable here given the Court's rejection of Allison's ineffective assistance claim. Thus, Allison has not set forth any cause for his procedural default. The fundamental miscarriage of justice standard, meanwhile, can be met only by a showing of actual innocence, *id.* at 83—a showing that manifestly has not been made here.

Accordingly, because Allison is unable to show any basis for overcoming his procedural default with respect to his due process claim regarding the prosecutor's comments, the Court rejects this ground as a basis for habeas relief.

### C. Allison's Due Process Claim Arising From the Denial of His Motion for a Required Finding of Not Guilty

▉▉▉ The Court now turns to Allison's final claim—that there was insufficient evidence upon which to convict him as a joint venturer, and that he was therefore denied due process when the trial judge denied his motion for a required finding of not guilty. The federal basis of this challenge lies in the Supreme Court's holding in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that pursuant to the Fourteenth Amendment's guarantee of due process, a conviction can stand only if there was sufficient evidence to justify a rational trier of the facts in finding guilt beyond a reasonable doubt.

In assessing Allison's claim that the *Jackson* standard was not met here, the Supreme Judicial Court employed a standard that was entirely consistent with *Jackson*—namely, whether a rational jury could have found beyond a reasonable doubt that the elements of joint venture liability were satisfied here such that Allison could be convicted for murder and armed robbery as a joint venturer. Allison does not appear to be contending in any meaningful respect that the Supreme Judicial Court used an inappropriate standard in assessing his claim; rather, his argument is fundamentally that the Supreme Judicial Court's decision constituted an unreasonable application of that standard.

▉▉▉ This Court disagrees. As the Supreme Judicial Court explained in *Allison*, under Massachusetts law, a conviction under a theory of joint venture requires evidence that the defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Allison*, 434 Mass. at 675, 751 N.E.2d 868 (citing *Commonwealth v. Bianco*, 388 Mass. 358, 366–367, 446 N.E.2d 1041 (1983)). This agreement need not be made in advance: "an anticipatory compact is not necessary for joint venture liability, as long as at the climactic moments the parties consciously acted together in carrying out the criminal endeavor." *Id.* at 676, 751 N.E.2d 868 (internal quotation marks omitted).

Here, the Supreme Judicial Court concluded that there was sufficient evidence

from which a rational jury could conclude that Allison discussed a plan with Hardy and Sullivan to kill Moran when the three men talked privately at South Border Road. Moreover, the court also ruled that the evidence that Allison was seen with Hardy and Sullivan "crouched over the victim making stabbing gestures" was sufficient to support Allison's liability for murder as a joint venturer, and that the evidence similarly permitted a conclusion that during the attack, the focus shifted "from one of killing to one of robbery," thus supporting Allison's liability for armed robbery as a joint venturer. *Id.* at 676–77, 751 N.E.2d 868.

Allison argues that the testimony of Commonwealth witnesses as to the timeline of events indicates that the men could not have had an opportunity to formulate a plan prior to Moran's murder. Even assuming *arguendo* that this were true, this argument remains entirely unresponsive to the other basis upon which the Supreme Judicial Court ruled that Allison's conviction as a joint venturer could stand: namely, the eyewitness evidence of Allison's active participation in the joint stabbing and simultaneous robbery of Moran. Allison has not even attempted to argue—nor could he—that the Supreme Judicial Court, in deciding that this eyewitness evidence alone was sufficient to establish Allison's liability for murder and armed robbery as a joint venturer, was an unreasonable application of federal law. The Court therefore denies Allison's petition with respect to this claim.

## III. CONCLUSION

Habeas relief is unwarranted in this case. The Supreme Judicial Court analyzed each of the claims presented here with reference to standards that are consistent with federal law, and its rejection of those claims was not objectively unreasonable. As such, Allison's petition for habeas corpus [Docket No. 1] is DENIED.

SO ORDERED.