COMMONWEALTH *vs.* ROBERT E. MCNICKLES.

Suffolk.   January 21, 1986. — April 23, 1986.

Present: PERRETTA, DREBEN, & FINE, JJ.

*Rape. Evidence,* Cross-examination, Bias, Sexual conduct, Expert opinion, Hospital record, Fresh complaint. *Witness,* Bias, Cross-examination, Expert. *Error,* Harmless. *Identification.*

Although the judge at a rape trial erred in precluding defense counsel, on cross-examination of the victim, from attempting to show that the sexual acts were consented to and that the victim fabricated the story of rape out of concern that her attempts to regain custody of her children would be weakened by a showing of her promiscuity, the error was harmless in view of the testimony of other witnesses, as well as closing argument, which effectively placed this issue before the jury, and in view of the overwhelming evidence, including testimony as to the victim's physical and emotional condition on her arrival at a hospital, that the sexual acts with three companions of the defendant had not been entered into willingly. [117-119]

At a rape trial, the diagnosis of a physician who examined the victim at a hospital shortly after she was attacked was properly admitted in evidence whether based on his own observation or on the "history" obtained from the victim, and the physician's reference to "a sexual assault," although improper, did not require reversal of the defendant's convictions in view of the judge's prompt curative instructions to the jury. [119-122]

A defendant on trial for rape, on a joint enterprise theory, was not entitled to an instruction that the jury should draw no negative inferences concerning the defendant from the victim's photographic identification of the defendant's alleged companion. [122]

At a rape trial there was no error in admitting the hospital records of the victim, even though the contents of the records had already been made known to the jury through the testimony of the physician and the nurse who prepared them, and the words "alleged rape," appearing in the records, were incidental to the victim's treatment and medical history and were not required to be excluded under G. L. c. 233, § 79. [123-124]

At a rape trial the judge's allowance of fresh complaint testimony by the victim and other prosecution witnesses and his instructions on that evidence presented no cause for reversal of the defendant's convictions. [124]

INDICTMENTS found and returned in the Superior Court Department on February 12, 1980.

The cases were tried before *Rudolph F. Pierce*, J.

*Diane C. Laine* for the defendant.

*Judy G. Zeprun*, Assistant District Attorney (*Brent Redstone*, Assistant District Attorney, with her) for the Commonwealth.

DREBEN, J. The defendant was convicted of rape and assault and battery.[1] He raises issues concerning: (1) the exclusion of questions designed to show that the alleged victim had a motive to lie; (2) the refusal to exclude a doctor's diagnosis of the victim's condition; (3) the refusal to give a limiting instruction with respect to an array of photographs provided by the police containing a picture of one of the defendant's companions; (4) the refusal to exclude the hospital records of the victim; (5) the refusal to exclude testimony of the victim as to her own fresh complaints; (6) instructions of the trial judge as to fresh complaint; and (7) the denial of a new trial. For the reasons stated below, we affirm the convictions.

The victim gave the following account of the events of January 1, 1980. About 4:00 P.M. the defendant, a man known to the victim,[2] accompanied by three male companions, forced his way into her apartment. By pushing the door, the defendant "slammed" her against a wall. After entering, the defendant slapped her repeatedly on the face, held her by the hair, and banged her head against a wall. He then grabbed her by her jersey and threw her on the floor. She landed on her back, her head hitting the floor "real hard." The defendant was standing over her. He picked her up by the neck of her jersey, forced her into the bedroom and hurled her on the bed. Still slapping her, he told her he wanted her "to take care of his friends." He demanded that she take off her clothes; when she refused, he tore them off.

---

[1] He was acquitted on an indictment for rape by unnatural intercourse and on an indictment for breaking and entering a dwelling with the intent to commit a felony.

[2] Although at first the victim testified that she had not previously had sexual relations with the defendant, after a side bar conference she admitted that she had had such a relationship with him.

One of the defendant's companions came into the bedroom, undressed himself, forced his penis into her mouth and thereafter had anal and vaginal intercourse with her. After the first companion left, the second followed, and had anal and vaginal intercourse with her. A few minutes later, the third man entered and took off his clothes. While he was in the room, the defendant came in, told the victim not to give the third man a hard time and hit her again. The third man had vaginal, anal, and oral intercourse with her. As soon as the men had left, the victim called the police. She was taken to Brigham and Women's Hospital where she arrived about 5:00 P.M.

At the hospital the victim was first seen by a nurse. The victim was so distraught that it took an hour and fifteen mintues to obtain her history. The nurse described her clothing as ripped and wet with a very pungent odor — the odor of semen. Her blouse was saturated — "I could have probably wrung it out." The nurse also noticed that the victim's cheek was reddened. The nurse put the victim in a special room because of "her condition with the clothing and the smell; and that she also was a very anxious woman. And I thought she needed to be isolated from the rest of the emergency room."

The nurse related as fresh complaint testimony what the victim had told her, a description of events similar to that testified to by the victim. The threats were more graphic — "If I didn't do this with his three dudes that I would — I'd be killed; that he would break my nose."

The emergency room physician who saw her about 6:15 P.M. with the nurse, also described the victim's condition. She was in a state of disarray; her blouse was ripped, wet, dirty and smelling of semen. She was upset and withdrawn. She had a reddened area on her cheek several inches in diameter, "remarkable enough that we . . . we did take a Polaroid photograph of it."[3] "Her major fear, to me, was whether or not she had been damaged internally." She complained of back pain.

---

[3] Some three hours later, at 9:00 P.M., a police officer who was investigating the matter saw the victim and described her cheeks as being bruised and red.

She had evidence of dried fluid on her chin and neck which upon examination with a Wood's lamp[4] gave a positive test, highly suggestive of semen. The victim also had a "very prominent angry scratch . . . a welt" across her chest,[5] and had fresh scratches on her lower back — as if it had been rubbed against some rough surface. Motile sperm was found in her vagina and semen in her rectal area. The doctor testified that of all the alleged rape cases he had seen during his two months in the emergency room, this case was the "most striking to me, because it was the case that there was the most evidence of physical violence."

The defendant took the stand. While he admitted having been in the victim's apartment (according to his account it was much earlier in the day), he insisted that the victim had consented to having sex with his three companions.[6]

1. *Evidence of the victim's motive.* The defendant argues that the judge erred in limiting his cross-examination of the victim for bias. He claims that the sexual acts were consensual; the victim had fabricated a story of rape because she feared that if it became known that she was entertaining various men in her apartment, she would be unable to regain custody of her five children. When defense counsel asked the complainant where her children were living, the Commonwealth objected. Defense counsel informed the judge that he intended to establish bias by showing that the victim's children had been taken away from her, that they had been placed in a foster home, and that because the victim was trying to regain them, she had second thoughts about "entertaining willingly." After holding a voir dire, the judge, for the reasons stated in the margin,[7] excluded further inquiry as to the custody of the victim's children.

---

[4] The doctor explained that a Wood's lamp is a "lamp that shines ultraviolet light which gives a characteristic slightly fluorescent green tinge to semen when examined."

[5] A tetanus injection was administered as a prophylactic measure.

[6] There was no claim the defendant had sexual relations with the victim on the date in question; he was tried on a theory of joint enterprise.

[7] THE COURT: "Now, let me make my ruling. I am not going to let you introduce that into evidence for the following reasons: Nothing has been

The judge's ruling was unwise. Even if no one in the Department of Social Services or in the Probate Court was informed of the victim's activities with men, her own concern that her attempts to regain custody of her children would be weakened by a showing of her promiscuity could show a motive to lie. See *Commonwealth* v. *Morris,* 20 Mass. App. Ct. 114, 117 (1985). The judge should have allowed the jury to hear and evaluate this evidence. See *Commonwealth* v. *Henson,* 394 Mass. 584, 587 (1985). See also *Commonwealth* v. *Joyce,* 382 Mass. 222, 229 (1981).

Any error, however, in this regard was harmless. "[H]ad the judge admitted the [excluded] testimony . . . it would have been without material effect on the jury." *Commonwealth* v. *Caldron,* 383 Mass. 86, 93 (1981). First, there was considerable testimony of other witnesses that the victim was trying to obtain her children. The defendant's former lawyer testified to the victim's fears of "what people would think after seeing her with several men in her apartment." The defendant testified that the victim was worried about it being known "that she was entertaining three black men," that she "was trying to get her kids" and that her social worker might find out. Two other defense witnesses also alluded to these concerns, and defense counsel in his closing argument pointed out that the victim's interest in getting her children back gave her a reason to lie.

We do not base our decision solely on the foregoing testimony which came entirely from the defendant's witnesses and must be viewed with caution. As indicated in *Commonwealth* v. *Britland,* 300 Mass. 492, 496 (1938), "Evidence of statements favorable to the defendant coming from the lips of the witnesses for the prosecution would be apt to be given complete credence by the jury, whereas coming from the defendant alone, they might be viewed with the suspicion that

developed here that suggests that anyone had informed the Probate Court of any conduct on the part of [the victim] which would have any adverse effect on her position as she sought custody. The mere fact that she may have engaged in one kind of relationship or another, I presume, and you're right, she may have done a good many things, but unless you can establish a connection with what it was she did and the court proceeding, then I don't believe it is relevant, and I don't think that it should be introduced."

they were of later invention." See also *Commonwealth* v. *Morris,* 20 Mass. App. Ct. at 119; *Commonwealth* v. *Piedra,* 20 Mass. App. Ct. 155, 158 (1985). If the only evidence of lack of consent had come from the victim, the inability to cross-examine that witness on these questions might have precluded the jury from making "a discriminating appraisal of [her] possible biases and motivations." *Commonwealth* v. *Elliot,* 393 Mass. 824, 831 (1985), quoting from *United States* v. *Tracey,* 675 F.2d 433, 437 (1st Cir. 1982). But cf. *Commonwealth* v. *Mormando,* 5 Mass. App. Ct. 815 (1977).

Here, however, there was overwhelming evidence, quite apart from the complainant's testimony, that her acts of sexual intercourse with the defendant's three companions were not entered into willingly. The victim's physical and emotional condition upon arrival of the hospital forcefully rebuts any claim of consent. We think there is no "reasonable possibility" that the excluded evidence might have made a difference. *Chapman* v. *California,* 386 U.S. 18, 23 (1967). *Delaware* v. *Van Arsdall,* 475 U.S. 673, 679-680 (1986). *Commonwealth* v. *Hanger,* 377 Mass. 503, 510-511 (1979), and cases cited.

2. *Opinion of the examining physician.* The emergency room physician was questioned by the prosecution as to whether he had reached a diagnosis based on the victim's history and his examination. The specific questions and answers, as well as the judge's curative instruction, are set forth in the margin.[8]

---

[8] Q. "Now, Doctor, on the basis of the history you obtained from the patient in the examination you performed, did you reach a diagnosis as to her condition?"

A. "Well, she had had evidence of a recent session of intercourse —"

MR. COLE: "I'm going to object to that now. I'm going to object. It calls for a yes or no answer."

THE COURT: "Well, the first question, Doctor, that was asked of you by Mr. Redstone simply requires an answer of yes or no. Did you reach a diagnosis?"

THE WITNESS: "Yes, I did."

*             *             *

Q. "Was that diagnosis reached to a reasonable degree of medical certainty according to your profession?"

A. "I believe so."

The defendant claims it was error to permit the doctor to express an opinion based in part upon the victim's history. He also claims as a separate ground that the doctor's diagnosis was improper because an expert may not give his opinion on the ultimate question in issue.

While a physician may testify to certain statements given to him by a patient, such as complaints and symptoms of pain, *Commonwealth* v. *Howard*, 355 Mass. 526, 528-529 (1969); see Liacos, Massachusetts Evidence 346 (5th ed. 1981); 3 Wigmore, Evidence § 688 (Chadbourn rev. 1970), he may not repeat the patient's statements that her injuries were caused by a sexual assault. *Commonwealth* v. *Sinclair*, 195 Mass. 100, 108-109 (1907). *Commonwealth* v. *Howard*, 355 Mass. at 528-530. See *Roosa* v. *Boston Loan Co.*, 132 Mass. 439, 440-441 (1882); *Commonwealth* v. *Gardner*, 350 Mass. 664, 666-667 (1966); *Commonwealth* v. *Guidry, post* 907, 908 (1986). Compare *Bouchie* v. *Murray*, 376 Mass. 524, 529 (1978). To permit such testimony would enhance the complainant's account of what had happened by the evidence of an expert. *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. 398, 404 n.8 (1985).

In addition, another somewhat related limitation[9] is placed on a doctor's testimony in rape cases. Unless there are particular

---

Q. "And what was that diagnosis?"

MR. COLE: "I object."

THE COURT: "Overruled."

MR. COLE: "Note my objection."

THE WITNESS: "A sexual assault."

Q. "Now, —"

THE COURT: "No, Doctor. Your medical diagnosis, not your opinion as to how it occurred."

THE WITNESS: "My medical diagnosis would be recent sexual intercourse; evidence of trauma to the cheek, anterior chest and lower back."

THE COURT: "All right. You ladies and gentlemen are instructed to disregard the Doctor's statement that it was a result of sexual assault."

[9] A physician's opinion that a rape has occurred would normally be based, in large part, on the complainant's account of what happened. Moreover, "the witness's opinion, presented as the unbiased testimony of an expert, could . . . substantially influence[ ] the jury's decision as to whom to believe." *Commonwealth* v. *Gardner*, 350 Mass. at 667.

facts which require a medical expert, a physician is not considered to have professional knowledge which would be of assistance to the jury in determining whether a rape has occurred. In *Commonwealth* v. *Gardner*, 350 Mass. at 667, the court stated, "We are not persuaded that a gynecologist, or other expert, possesses skills or special experience which might enable him to determine, from factors such as these [bruises and the victim's own statement of what had happened] that acts of intercourse amounted to rape. . . . Where the jury are equally capable of drawing the conclusion sought from an expert witness, the expert's testimony is inadmissible." Thus, in the absence of special circumstances, a physician "no matter how well qualified, may not be asked directly whether a rape or a sexual assault has occurred." *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. at 404. *Commonwealth* v. *Montmeny*, 360 Mass. 526, 528 (1971). This is not because the opinion touches on the ultimate issues that the jury must decide, but because they are as well equipped as the expert to assess the issues. *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982). *Commonwealth* v. *Mendrala, supra* at 403, and cases cited. *Commonwealth* v. *Guidry, supra* at 908.

The doctor's first answer, see note 8, *supra*, was inappropriate. Nothing suggests, however, that the question was "an attempt to elicit from the expert witness a direct opinion that a [sexual assault] had occurred."[10] *Commonwealth* v. *Montmeny*, 360 Mass. at 528. The judge immediately instructed the jury to disregard the "doctor's statement that it was a result of sexual assault." Although unfortunate, we do not think the statement, in these circumstances, requires reversal.

The doctor's diagnosis, which was admitted in evidence: "recent sexual intercourse; evidence of trauma to the cheek, anterior chest and lower back," was an entirely proper answer even if based on the "history . . . obtained from the patient," including her account of what had happened.[11] The diagnosis

---

[10] Prosecutors would be well advised to take special care to instruct their witnesses, prior to putting them on the stand and asking their opinions, to avoid such terms as "rape," "sexual assault," and the like.

[11] As we indicated earlier, a patient's statements, that is, the "history" includes information to which a doctor may testify. Here the defendant did

as related to the jury contained no information additional to that previously given by the doctor which had been based only on his direct observations. See *Commonwealth* v. *Peets*, 8 Mass. App. Ct. 916, 916-917 (1979).

3. *Refusal to instruct concerning photographic array.* A police detective investigating the case was questioned about the victim's identification of one of the defendant's companions. He testified that he had shown the victim an array of pictures, *not including the defendant's picture*, in September, 1980. At that time, the detective testified, the defendant's companion was under arrest.

The defendant requested, but was refused, an instruction that "any reference made to any photographs shown to the . . . alleged victim . . . should not reflect adversely or suggest any comparability on the part of this defendant." On appeal the defendant argues that the detective's testimony could well have suggested to the jury that the array of photographs were "mugshots" and thus that the companion had a criminal record. See *Commonwealth* v. *Blaney*, 387 Mass. 628, 637-638 (1982). Since the defendant was tried on a joint enterprise theory, he argues that this inference was damaging.

We think the cases relied on by the defendant[12] are inapposite. The picture was not introduced in evidence, compare *United States* v. *Fosher*, 568 F.2d 207, 214 (1st Cir. 1978), it was not of the defendant, its source was not given, and there was no suggestion that it was a mugshot. Moreover, the companion had been arrested prior to the array being shown, and "the jurors might well have inferred" that his picture was taken subsequent to his arrest for the crime at bar. See *Commonwealth* v. *Parry*, 1 Mass. App. Ct. 730, 736-737 (1974). There was no error in refusing to give the requested instruction.

---

not give the reason for his objection, and he did not specify whether his objection was to the "history," to the seeking of a medical opinion, or to a portion of the history. We do not, however, base our opinion on the lack of a proper objection.

[12] *Commonwealth* v. *Lockley*, 381 Mass. 156, 166 (1980). *Commonwealth* v. *Blaney, supra. Commonwealth* v. *Francis*, 391 Mass. 369, 374 (1984). *Commonwealth* v. *Tuitt*, 393 Mass. 801, 808-809 (1985).

4. *Admission of hospital records.* The defendant claims it was error to admit in evidence the sanitized medical records of the complainant as the contents of the records had already been made known to the jury through the testimony of the doctor and nurse who had prepared them. Relying on *Bouchie v. Murray*, 376 Mass. at 527, he argues that this duplication is contrary to the intent of G. L. c. 233, § 79.[13]

There was no error in admitting the records. Although G. L. c. 233, § 79, was "enacted primarily to relieve the physicians and nurses of . . . hospitals from the hardship and inconvenience of attending court as witnesses" *Bouchie, supra,* quoting from *Leonard* v. *Boston Elevated Ry.*, 234 Mass. 480, 482 (1920), the statute does not limit the admissibility of hospital records to those cases where the preparers of the reports are absent. Even if the information was entirely cumulative, the judge had discretion to admit the records. The defendant's reliance on *Commonwealth* v. *McDuffie*, 16 Mass. App. Ct. 1016, 1017 (1983), is misplaced. There, a rape incident report was held inadmissible as a hospital record under § 79 primarily because much of the report contained multiple hearsay statements. It does not appear that the report would have been excluded solely on the ground that the Commonwealth did not need the evidence.

The defendant also objects to the refusal of the judge to order the words "alleged rape" removed[14] from the records on the ground that these words have "reference to the question of liability" and must be excluded under G. L. c. 233, § 79. The words "alleged rape" are similar to terms considered inci-

---

[13] General Laws c. 233, § 79, as appearing in St. 1959, c. 200, provides in relevant part: "Records kept by hospitals . . . under [G. L. c. 111, § 70] shall be admissible . . . as evidence . . . so far as such records relate to the treatment and medical history of such cases . . . but nothing therein contained shall be admissible as evidence which has reference to the question of liability."

[14] Although the defendant challenges other phrases in the hospital record, he did not object to them previously and stated, "Everything else is fine, Judge." The phrases now objected to do not create a substantial risk of a miscarriage of justice for the reasons set forth later in this opinion in our discussion of the words "alleged rape."

dental to "treatment and medical history" and are admissible under the statute. See *Commonwealth* v. *Concepcion*, 362 Mass. 653, 655-656 (1972), and cases cited. Even if not, the words added nothing to other evidence presented in this case. *Commonwealth* v. *Gogan*, 389 Mass. 255, 264 (1983). *Commonwealth* v. *Cutter*, 9 Mass. App. Ct. 876, 877 (1980).

5. *The defendant's remaining contentions.* We have reviewed the defendant's other claims and find them to be without merit. His claim that it was error to allow the victim to testify to her fresh complaint to the nurse is indistinguishable from the claim rejected in *Commonwealth* v. *Leroux*, 12 Mass. App. Ct. 886, 887 (1981). Although the defendant also argues that the victim's testimony permitted her to fill in some gaps, no omissions or additions are specified. Our review of the testimony indicates that it added nothing to the nurse's fresh complaint evidence.

Nor did the judge err in refusing to give the defendant's requested instruction to the effect that the jury were not to consider the fresh complaint testimony even for limited purposes "if you find the statements made by" the complainant to the doctor, the detective, and the nurse "were not made reasonably promptly after the alleged rapes occurred." The promptness of the complaints was never an issue at trial, they were made within hours of the incident and it was obvious that the judge concluded, quite correctly, that the complaints were "fresh." See *Commonwealth* v. *Sherry*, 386 Mass. 682, 691 (1982).

The defendant also argues that no limiting instructions were given as to the use of the fresh complaint testimony with respect to the witnesses, other than the nurse, who reported the victim's statements. The defendant did not object to the instructions, and there is here no substantial risk of a miscarriage of justice. Moreover, the judge's instructions were probably sufficient to cover all such fresh complaint evidence.

Contrary to the defendant's contention, a review of the transcript indicates that the judge did not abdicate his role or refuse to consider the evidence in denying the defendant's motion for a new trial. The judge merely disagreed with the defendant as to the strength of that evidence.

In sum, we see no reason to set aside the verdicts or to order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*