NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-750                                          Appeals Court

COMMONWEALTH  vs.  MIGUEL LOPEZ.

No. 13-P-750.

Hampden.     February 6, 2014. - July 30, 2014.

Present:  Cypher, Graham, & Carhart, JJ.


Rape.  Assault and Battery.  Constitutional Law, Speedy trial.
    Evidence, Hospital record, Disclosure of evidence.
    Practice, Criminal, Speedy trial, Discovery, Disclosure of
    evidence.


    Indictments found and returned in the Superior Court
Department on July 27, 2011.

    A motion to dismiss was heard by C. Jeffrey Kinder, J., and
the cases were tried before Bertha D. Josephson, J.


    David M. Skeels, Committee for Public Counsel Services, for
the defendant.
    Deborah D. Ahlstrom, Assistant District Attorney, for the
Commonwealth.


    CYPHER, J.  The defendant, Miguel Lopez, was convicted by a

jury of rape, G. L. c. 265, § 22(b), and assault and battery,

G. L. c. 265, § 13A(a).  He appeals, claiming (1) that he was

prejudiced by the lack of a speedy trial and (2) that the Commonwealth failed to provide mandatory discovery.  We affirm.

Background.  On July 27, 2011, a Hampden County grand jury returned indictments against the defendant on the underlying charges.  The defendant was arraigned on August 9, 2011, and counsel was appointed.  On November 15, 2012, the defendant filed a motion to dismiss on speedy trial grounds, with a supporting memorandum.  After a hearing on the motion five days later, the judge denied the motion.

A jury trial began on December 11, 2012, after which the defendant was found guilty on both charges.  On December 19, 2012, the defendant was sentenced on the rape conviction to a term of not more than ten years, and not less than nine years, to be served at the Massachusetts Correctional Institution at Cedar Junction.  On the assault and battery conviction, the defendant was sentenced to the Hampden County house of correction for two and one-half years, the sentence to run concurrently with the sentence to be served on the rape conviction.

Facts.  A jury could have found the following facts.  On July 11, 2010, the victim, Valerie,[1] was living in an apartment with her stepdaughter.  The defendant lived upstairs in the same

---

[1] A pseudonym.

apartment building with his wife, who was out of town at the time.  Valerie knew the defendant because he was a good friend of Valerie's former boyfriend, Frank,[2] who had recently ended their relationship.  Valerie was also a friend of the defendant's wife.

At 6:00 $\underline{A}$.$\underline{M}$. on the morning of July 11, 2010, Valerie received a telephone call from the defendant, who told Valerie that Frank had called the defendant and requested that he retrieve Frank's dog.  Valerie told the defendant to have Frank call her directly, but the defendant told her that he had spoken to Frank and Frank wanted Valerie to bring the dog upstairs to the defendant's apartment.  Valerie got dressed, took the dog upstairs, and knocked on the defendant's back door.

The defendant answered the door wearing boxer shorts and a tank top.  Valerie handed the leash to the defendant and then turned to leave.  The defendant grabbed Valerie by the wrist and dragged her to his bedroom in the front of the apartment.

The defendant forced Valerie onto his bed and, as he held her wrists in one hand and leaned on her with his chest, he pulled down her pants and her underwear.  The defendant told Valerie "that he always wanted [her]" and "he didn't care what [Frank] had to say or do."  The defendant forced his penis into

---

[2] A pseudonym.

Valerie's vagina.  The whole time, Valerie was yelling and telling him to stop.  Valerie tried, but was unable to push the defendant off of her.  Valerie was not sure how long the rape lasted, but when the defendant ejaculated, he let Valerie go and she ran back to her apartment.

When Valerie returned to her apartment, she took off all her clothes and got into the shower.  She felt disgusted and was unable to control her anxiety and her crying.  At approximately 6:30 A.M., Valerie's stepdaughter awoke when she heard the back door slam shut.  She went to the bathroom and found Valerie there, sitting in the bathtub with the shower on, crying.  The stepdaughter tried to calm Valerie down, but she kept crying and repeating, "I feel disgusted. I didn't want him to.  I didn't want him to."  Eventually the stepdaughter got Valerie out of the bathroom, clothed, and into the stepdaughter's bedroom. There, Valerie told her stepdaughter what had happened.  After learning about the rape, the stepdaughter called her father who, in turn, called the police.

Officer Peter Manolakis of the Springfield police department arrived at the apartment at approximately 7:45 A.M. and met Valerie and her stepdaughter.  The stepdaughter was sitting on the couch with her arm around Valerie, who the officer described as distraught.  Officer Manolakis called for an ambulance and then collected the clothes that Valerie had

been wearing.  Valerie received medical attention and biological evidence was collected with a rape kit.

Peggy Rodriguez, a deoxyribonucleic acid (DNA) analyst at Orchid Cellmark (Cellmark), a private genetic testing facility, analyzed the samples from the rape kit and compared the results with the known DNA profiles.  Rodriguez concluded that the epithelial fraction from the vaginal swab had a mixture that was consistent with a woman and a man.  The sperm fraction from the vaginal swab contained a mixture from at least three individuals, including at least one male.  Rodriguez identified the defendant as a contributor[3] and Valerie as a potential contributor.  Frank was excluded as a potential contributor.

Testifying on his own behalf, the defendant said that he met Valerie as the result of his friendship with Valerie's former boyfriend, Frank.  The defendant claimed that at some point prior to July, 2010, his relationship with Valerie changed and they started having an intimate relationship.  They would

---

[3] Rodriguez estimated that the probability of the occurrence of the defendant's genetic profile at thirteen loci was one in 8.033 quintillion unrelated individuals for the black population; one in 764.4 quadrillion unrelated individuals in the Caucasian population; one in 4.129 quintillion unrelated individuals in the southwest Hispanic population; one in 2.645 quintillion unrelated individuals in the southeast Hispanic population; and one in 3.582 quintillion unrelated individuals in the general Asian population.  Rodriguez produced a chart of the DNA profiles and explained it to the jury.  The DNA chart was admitted in evidence.

have sexual relations in Valerie's apartment when Frank was not around, according to the defendant's testimony.  The defendant said that he and Valerie would have a couple of beers, smoke some marijuana, and then have sex.

According to the defendant, Valerie came to his apartment at about 10:00 $\underline{P}$.$\underline{M}$. on the night of July 10, 2010.  They drank a couple of beers, smoked marijuana, and had consensual intercourse.  Valerie left the defendant's apartment a little after midnight.  But before Valerie left, she and the defendant got into a "little argument."  The defendant was concerned that Valerie's relationship with his son was inappropriate.  The defendant called Valerie a slut and a whore.  Valerie, in return, called the defendant some bad words.

After an angry exchange of about ten minutes, Valerie left the defendant's apartment.  The defendant denied calling Valerie about the dog and disputed her claim that she had come to his apartment at 6:00 $\underline{A}$.$\underline{M}$. on July, 11, 2010.

1. Speedy trial claims.  The defendant argues that the prosecutor was unreasonably lacking in diligence in bringing the defendant to trial because he waited over eleven months after the arraignment date before obtaining a court order for the victim's medical records, a delay that was extended when the records were not delivered to court for another five months.  According the defendant, he was prejudiced by this delay because

he was in custody awaiting trial.

In contrast to the defendant's speedy trial claim that was presented below and primarily grounded on the case management provisions found in Mass.R.Crim.P. 36(b), 378 Mass. 909 (1979), the claim on appeal is pressed solely as a constitutional violation under the State and Federal Constitutions,[4] and Mass.R.Crim.P. 36(c), 378 Mass. 912 (1979), the portion of the rule that encompasses the "fundamental constitutional guarantee" to a speedy trial.[5] Reporters' Notes to Rule 36(c), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1728 (LexisNexis 2013).

"[T]he relevant factors in determining whether a defendant's [Federal] constitutional right [to a speedy trial] has been denied, see Barker v. Wingo, 407 U.S. 514, 530 (1972), are: the length of the delay, the reasons for the delay, the

---

[4] On appeal the defendant claims violations of the Fourteenth Amendment to the United States Constitution, and art. 11 and art. 12 of the Massachusetts Declaration of Rights. His motion to dismiss cited the Sixth and Fourteenth Amendments and art. 11, but it did not cite art. 12.

[5] Contrary to the Commonwealth's contention on appeal, the defendant's claim under Mass.R.Crim.P. 36(c) was preserved below where he argued in his motion that he was entitled to a dismissal on grounds that the prosecutor was unreasonably lacking in diligence in bringing the case to trial and he was thereby prejudiced; the Commonwealth responded to this claim in its opposition memorandum; and the motion judge denied the motion "for the reasons set forth in the Commonwealth's opposition."

extent of the defendant's assertion of his right to a speedy trial, and the prejudice, if any, to the defendant." Commonwealth v. Willis, 21 Mass. App. Ct. 963, 964 (1986) (quotations and citation omitted).  Here, "the defendant's constitutional right [to a speedy trial] under the Barker v. Wingo analysis will be protected by considering the factors entitling the defendant to a dismissal under [rule] 36(c) . . ., that is, if '(1) the conduct of the prosecuting attorney in bringing the defendant to trial has been unreasonably lacking in diligence and (2) this conduct on the part of the prosecuting attorney has resulted in prejudice to the defendant'" (footnote omitted).  Ibid.

The difficulty with the defendant's claim is that the sluggishness with which the hospital records were produced had little bearing on the progress of the case because they were largely cumulative of the Commonwealth's proof.  The independent evidence of the crime consisted of the victim's testimony that she had been battered and raped, the first complaint witness who articulately outlined the victim's distraught demeanor and description of the crime within thirty minutes of it having occurred, police testimony confirming the victim's distraught demeanor, the hospital nurse who explained how evidence is collected using the rape kit, the testimony of the emergency room doctor who described the physical examination, and DNA

evidence that revealed a match between DNA profile obtained from the sperm detected in the victim's vagina hours after the crime and a known sample from the defendant.

To the extent the hospital records were relevant, they were primarily of assistance to the defense.  Trial counsel used the records to elicit from the hospital nurse that the victim had been proscribed Prozac, Albuterol, and Percocet, as well as testimony from the emergency room doctor that there was absolutely no physical indication of trauma, tearing, or even redness, in any part of the victim's genital area.  That the records were exculpatory is bolstered by counsel's agreement to their admission.

Although it is certainly true that the Commonwealth included the need to obtain the medical records as among its reasons for requesting a continuance on July 17, 2012, about eleven months after the arraignment date, the continuance was not objected to by the defendant.  Moreover, unlike the situation presented in Commonwealth v. Balliro, 385 Mass. 618 (1982), in which the prosecutor's delay prevented the trial from going forward, the Commonwealth did not need the medical records to try the defendant.  See id. at 621-623 (although the Commonwealth had known for several weeks that no charge based on the operation of a motor vehicle while under the influence of alcohol could be proved, it waited until the day of trial to

correct the error). In these circumstances, there is no evidence that the delay in obtaining the hospital records evinces proof that the prosecutor was unreasonably lacking in diligence in bringing the defendant to trial.

2. <u>Mandatory discovery claim</u>. The defendant next argues that his convictions should be vacated and the case dismissed because the Commonwealth failed to disclose an electronic mail message (e-mail) exchange between the Cellmark analyst, her technical reviewer, and the State police crime laboratory (State lab). According to the defendant, the e-mail exchange reveals that the Cellmark analyst changed her report after communicating her original analysis to the State lab. Both the original and the revised reports were provided to the defendant prior to trial.

The defendant is correct that the prosecution had a duty to provide the defense with "statements of persons the party intends to call as witnesses" prior to the pretrial conference. Mass.R.Crim.P. 14(a)(1)(A), as amended, 444 Mass. 1501 (2005). The mandatory disclosure includes all relevant evidence in the custody of "persons who have participated in investigating or evaluating the case and either regularly report to the prosecutor's office or have done so in the case." <u>Ibid</u>. See <u>Commonwealth</u> v. <u>Martin</u>, 427 Mass. 816, 824 (1998). In <u>Commonwealth</u> v. <u>Martin</u>, <u>supra</u> at 817, the trial judge granted

the defendant a new trial because of the "effect of the Commonwealth's failure to timely disclose . . . evidence [to defense counsel] combined with defense counsel's failure to present a competent rebuttal of the prosecution's case."  The case before us does not present a similar circumstance causing prejudice to the defendant because, as the Commonwealth points out, the two Cellmark reports were provided to defense counsel as required.  The original report (dated November 30, 2011) stated:  "The DNA profile obtained from the sperm fraction of the vaginal swabs is a mixture of at least three individuals, including at least one unknown male."  The revised report (dated December 21, 2011) stated:  "The DNA profile obtained from the sperm fraction of the vaginal swabs is a mixture of at least three individuals, including at least one male."  Whether the third person was male or female, or whether that person's identity was "unknown," is inconsequential since the defendant was consistently identified in both reports as having contributed to the mixture, identity was not an issue at trial, and, as the defendant's brief notes, the victim's medical records indicate that she had reported having consensual sexual intercourse eighty-four hours before the rape.

The substance of the e-mail communication between Cellmark and the State lab therefore cannot be considered exculpatory under the facts of this case.  Furthermore, withholding such e-

mails was not prejudicial because those e-mails would not have any tendency to prove the defense's theory that the sexual contact was consensual. The defendant testified at trial that he had an ongoing sexual relationship with the victim and that he had consensual sexual intercourse with the victim on the evening of July 10, 2010. The victim testified that she never had consensual sexual intercourse with the defendant and that the defendant had raped her on the morning of July 11, 2010. The fact that sexual contact had occurred between the defendant and the victim was not in dispute at trial and neither was the credibility or competency of the Cellmark DNA analysis. The jury had only to decide the issue of consent. Neither the evidence showing the DNA of a third party, nor the medical records containing information about the victim's consensual sexual activity hours before the rape, aids the defense theory that the contact was consensual.

In Commonwealth v. Jewett, 442 Mass. 356, 360 (2004), the defendant argued that the prosecutor improperly deprived the jury of material evidence. In affirming the defendant's convictions of rape and other charges, the Supreme Judicial Court held that the evidence showing the presence of old sperm on the victim, even if admissible, "could not have [been] considered as new, material, or helpful in any way, much less potentially 'dispositive' as the defendant claim[ed]." Id. at

362.  There, as here, the defendant claimed that the sexual conduct was consensual and ongoing.  The court reasoned that "the allegedly exculpatory documents cannot be said to be material to his defense . . . that he and the victim had sexual intercourse prior to the night" of the rape.  <u>Ibid</u>.  Similarly, the e-mail communication in the case before us was neither material nor prejudicial.

<u>Conclusion</u>.  We reject the defendant's arguments and affirm his convictions on the charges of rape and assault and battery.

<u>Judgments affirmed</u>.